UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Champion, et al.<br><br>              Plaintiffs,<br><br>    v.<br><br>Does,<br><br>              Defendants. | Civil Action No. 1:22-cv-02697 (CKK) |

## **PLAINTIFFS' EX PARTE MOTION FOR EXPEDITED DISCOVERY**

### INTRODUCTION

      Plaintiffs submit this Motion for Expedited Discovery to uncover the identities of the Doe Defendants who are liable for the telephone spam that Plaintiffs and class members have received. Plaintiffs seek to obtain this information from third parties pursuant to Fed. R. Civ. P. 45 by subpoenaing factual information relevant to the identities of the Doe Defendants. Plaintiffs request an Order from this Court:

    (1)    granting Plaintiffs' Motion for Expedited Discovery prior to a Rule 26(f) conference;

    (2)    requiring third parties to produce the information and documents responsive to the subpoenas; and

    (3)    providing any other relief the Court deems just and proper.

### FACTS

    1.    Plaintiff Joshua Champion ("Champion") has received at least 2,513 spam text messages and calls in the last three years in which the spammers have hid their identity. (Complaint at ¶ 9 [Dkt. 1]).

2. Plaintiff Christina Jones ("Jones") has received at least 49 spam text messages and calls in the last four months in which the spammers have hid their identity. *Id*. at ¶ 10.

3. In addition to Champion and Jones, Plaintiffs' counsel has hundreds of other clients who have received and reported thousands of spam texts and calls in which the spammers have hid their identity. These calls and texts have come from many of the same Doe Defendants that have spammed Champion and Jones. *Id*. at ¶ 11.

4. Plaintiffs and class members have spent thousands of hours trying to uncover the identities of the Doe Defendants, but so far have been unable to, and will not be able to without the aid of discovery. *Id*. at ¶ 12.

5. Most the telephone spam that Plaintiffs and class members have received from the Doe Defendants involves multiple parties, who each may be liable for the spam. *Id*. at ¶ 39.

6. How many parties are involved in the telephone spam—and which parties are liable for TCPA violations—depends on how the telephone campaign is arranged. *Id*. at ¶ 48.

7. To understand what parties can be involved, it is necessary to understand the following components of any telephone campaign:

<u>Always present in a telephone campaign</u>

  i. **Lead Generator** – The party who generates leads or phone numbers to call
  ii. **Caller** – The party initiating and sending the SMS or calls
  iii. **Seller** – The party whose goods or services are being promoted

<u>Sometimes present in a telephone campaign</u>

  iv. **Marketing Broker/Affiliate Network** – A party connecting Sellers with Callers

*Id*. at ¶ 40.

8. If a company wants to promote its services without having to worry about the lead generation or the calling campaign, the company could hire a Lead Generator and a Caller. The

2

Lead Generator will generate phone numbers to be called. The Caller will call the generated phone numbers and promote the Seller's services. In this arrangement there are three separate parties, each respectively acting as the Lead Generator, Caller, and Seller. *Id.* at ¶ 43.

9. A Seller who wants to promote its services at scale can also hire a Marketing Broker ("Broker"). Brokers go by various names, the most common being "Affiliate Network." A Broker will have one or more Callers who promote the Seller's services in exchange for performance-based commission. For example, for each sale that a Caller generates, a Seller might pay $80 to the Caller and $20 to the Broker. *Id.* at ¶ 44.

10. Over 95% of all the SMS spam sent by the Doe Defendants to Plaintiffs and class members involves two Brokers or more. This happens when a Broker outsources to a second Broker, who outsources to a third Broker, etc., like this:

*Seller → Broker 1 → Broker 2 → Broker 3 → Caller → Lead Generator*

*Id.* at ¶ 45.

11. Sellers and Brokers often exercise control over their Callers or are aware that their Callers are violating the TCPA. *Id.* at ¶ 46.

12. Callers are usually incorporated companies in which the companies' founders, executives, and principals are personally sending, directing, and overseeing the telephone spam. *Id.* at ¶ 47.

13. When individuals receive spam involving different Brokers and Sellers, it is still often from the same Caller. For instance, in a previous *Doe* suit in this district, Champion uncovered the identity of single spammer (Michael Boehm) who sent spam using 25 different Brokers. See *Joshua Champion v. Does 1-10*, 1:22-cv-00323 (D.D.C.). Websites like OfferVault.com aggregate the information of over 1,000 Affiliate Networks / Brokers, making it easy for Callers to work with thousands of Brokers and promote the goods and services of tens of thousands of Sellers. *Id.* at ¶ 48.

14. Multiple data points indicate that the same Doe Defendants who are liable for spamming Champion and Jones are also liable for spamming Plaintiffs' counsel's other clients.

3

For example, in Champion's prior *Doe* suit in this district, discovery uncovered 14 other clients who received spam from Michael Boehm. There was an additional 50+ clients who potentially received spam from Michael Boehm, but discovery was limited to the spam Champion received, so the spam involving the 50+ other clients is still uncertain. As another example, in the current *Doe* suit with Champion and Jones, one of the Brokers involved is Affiliati Network. Plaintiffs' counsel has 101 other clients who have received 609 spam text messages that involve Affiliati Network. But counsel needs discovery to determine who is the Caller or is otherwise liable. *Id*. at ¶ 49.

15. Because the Doe Defendants hide their identities, it is impossible to know who they are and who they have spammed. *Id*. at ¶ 50.

16. The Doe Defendants have used many tactics to hide their identities, including purposefully not telling who they are, using fake names, creating anonymous web pages, registering their U.S. companies overseas, providing invalid call back numbers so they cannot be reached, not answering when someone returns missed calls, immediately hanging up if you ask what business they are with, and more. *Id*. at ¶ 51.

17. Plaintiffs have already identified phone carriers, domain registrars, Sellers, Brokers, and others who have discoverable information related to the identities of the Callers and others who may be liable. Subpoenas to these parties should reveal the identities of the Callers initiating the calls and texts, as well as the identities of those who may be individually or vicariously liable. *Id*. at ¶ 52.

18. When Callers send text messages, they usually include URL hyperlinks in the text messages. Sellers, Callers, and Brokers track their marketing efforts by using data in these URLs. For example, in the URL example.com?**S1**=2337&**S2**=5215&**S3**=632 there are three parameters: S1=2337, S2=5215, and S3=632. These parameters may identify the Seller, the Brokers, the Caller, the product being sold, or some other relevant data. While there is no uniform naming convention, parties keep very meticulous records of the values in the URLs. Subpoenas about the

URLs involved in the text messages to Plaintiffs and class members will reveal what the parameters represent and who the responsible parties are behind the telephone spam.

19. Plaintiffs' counsel has extensive experience uncovering the identities of unknown spammers through forensics and subpoenas.

20. Plaintiffs' counsel is a boutique law firm whose sole practice is representing clients who have received unwanted telephone spam.

21. Plaintiffs' counsel has an entire in-house investigative division whose only responsibility is tracking down and identifying telephone spammers. The in-house investigators have training and experience from the U.S. military in open source intelligence.

22. The lead investigator for Plaintiffs' counsel is a retired US Army Counterintelligence Special Agent with a degree in Intelligence Studies from American Military University. He has over 20 years of experience in Intelligence operations tracking down spies and members of International Terrorist Organizations and their financial and operational networks.

23. Here are just three examples of lawsuits that illustrate Plaintiffs' counsel experience and expertise uncovering unknown spammers.

    i. In a previous *Doe* suit in this district, Champion uncovered the identity of Michael Boehm through subpoenas to phone carriers, domain registrars, and brokers. See *Joshua Champion v. Does 1-10*, 1:22-cv-00323 (D.D.C.). The subpoena responses also revealed that 14 other clients of Plaintiffs' legal counsel received spam from Michael Boehm. *Id.* The case was transferred to the Central District of California, and the other 14 plaintiffs were added to the suit. *Id*.

    ii. In a previous *Doe* suit in the District of Utah, Plaintiffs' counsel uncovered the identity of a prolific spammer through subpoenas to third parties. See *Kenney v. Does 1 – 20,* 2:19-cv-00882 (D. Utah). The spammer identified was Christopher Kay and his business entity Blue Global, LLC. Mr. Kay is a bad actor, having previously been sued by the Federal Trade Commission ("FTC") just two years

        prior for stealing people's personal information; Kay agreed to a $104,470,817 suspended monetary judgment with the FTC. See *Federal Trade Commission v. Blue Global, LLC and Christopher Kay*, 2:17-cv-02117, Dkt 4 (D. Ariz.).

    iii.    In 2019 security researchers uncovered a spam operation called APEXSMS that had sent over 80 million spam text messages without consent to Americans nationwide. See [SMS Spammers Doxxed](#) (last accessed August 30, 2022). After this article exposed APEXSMS, the spammers changed their name, went underground even more, and continued to spam. Nobody knew who was responsible for this operation. After more than a year of forensic research, Plaintiffs' counsel uncovered that Champion, and other clients of Plaintiffs' counsel, had received spam from APEXSMS. Last month, Champion and another client filed suit against the principals of APEXSMS. See *Champion, et al. v. Sethi, et al.*, 2:22-cv-01355 (D. Ariz.). This lawsuit is the first time the principals of APEXSMS have ever been sued and held accountable for sending millions of spam text messages without consent. They have evaded liability so far because they have gone to great lengths to hide their identity.

24.    The plague of telephone spam needs to be stopped. It can be stopped. But the parties responsible for the spam must first be identified.

25.    Plaintiffs have identified the following phone carriers, domain registrars, Sellers, and Brokers with discoverable information that will lead to the identification of the Doe Defendants.

### *Subpoenas To Phone Carriers*

26.    The Doe Defendants initiated the calls and texts using phone carriers. These phone carriers have information about who their customer was who initiated the calls or texts. The information from the phone carriers will assist Plaintiffs in identifying Defendants.

27.    The Phone Carriers likely to have information include, but are not limited to:

- Inteliquent
- Twilio
- Bandwidth
- Peerless Network
- Commio
- Telnyx
- Level 3
- CoreTel Communications

*Subpoenas To Domain Registrars and Domain-Related Parties*

28. The text messages to Plaintiffs contained URLs and domains.

29. An example of a domain is google.com.

30. Most the URLs in the text messages, when clicked, redirected to other domains and websites.

31. Domain Registrars have information about who registered these domains which would assist Plaintiff in identifying the Doe Defendants.

32. Additionally, there are other Domain-Related Parties who provide DNS hosting, server hosting, email hosting and other IT services for these domains and websites. These Domain-Related Parties have information which would assist Plaintiffs in identifying the Doe Defendants.

33. The Domain Registrars and Domain-Related Parties likely to have information include, but are not limited to:

- NameCheap
- CloudFlare
- Name.com
- Google
- GoDaddy

- Tucows
- Above.com
- Amazon
- MarkMonitor
- NameSilo
- Internet Domain Service
- 1&1 IONOS

*Subpoenas to Sellers and Brokers*

34. Many of the Doe Defendants initiated calls and texts on behalf of Sellers or Brokers. These Sellers and Brokers have information about other Brokers who may have been involved, and who the Caller was who initiated the calls or texts. These Sellers and Brokers will also have information regarding what control was exercised over their Callers and whether they had prior knowledge of a Caller's spam. The information from the Sellers and Brokers will assist Plaintiffs in identifying the Doe Defendants.

35. The Sellers and Brokers likely to have information include, but are not limited to:

- Addicted Affiliate
- AdMediary
- Affiliati Network
- Aragon Advertising
- BuyGood.
- Cannaball
- Diablo Media
- Digital Media Solutions
- EverQuote.
- Giraffe Media Group

- Guru Media
- IceNetworks
- Jakob Group Marketing
- LeadVision Media
- Mint Global Marketing
- Next Click Partners
- Perform[cb]
- QuoteLab
- RainMaker Network
- RewardZone USA
- Skyrocket Media
- What If Media Group
- Xanadu Marketing

*Subpoenas to Other Parties*

36. The responses to Plaintiffs' subpoenas may reveal additional parties who have information which would assist Plaintiff in identifying Defendants, such as UPS Stores, landlords, email providers, and others.

**LEGAL STANDARD & ARGUMENT**

Under Fed. R. Civ. P. 26(d)(1), the Court has the power to order that a party may seek discovery before the discovery planning conference. Fed. R. Civ. P. 26(d)(1), (f). Upon a "showing of good cause," discovery has been allowed from internet service providers regarding John Doe defendants. *Arista Records, LLC v. Does 1-19*, 551 F. Supp.2d 1, (D.D.C. 2008). See, also, *Crazy ATV, Inc. v. Probst*, No. 1:13-cv-00114-RJS-DBP, 2014 U.S. Dist. LEXIS 6414, at **3–4 (D. Utah Jan. 16, 2014) (citing *Arista Records LLC v. Does*, No. 2:07 cv 0971 TS, 2008 U.S. Dist. LEXIS 2393, at *3 (D. Utah Jan. 11, 2008) (describing that case as "allowing limited discovery on third party Internet Service Providers to ascertain identities of unknown

defendants"). Good cause can be shown "where physical evidence may be consumed or destroyed with the passage of time, thereby disadvantaging one or more parties . . . ." *Qwest Commc'ns Int'l, Inc. v. WorldQuest Networks, Inc.*, 213 F.R.D. 418, 419 (D. Colo. 2003)."

Other courts have granted early discovery when there was no other way for the case to move forward. See, e.g., *Sunlust Pictures, LLC v. Cisa,* 2012 WL 5187837, at *6 (D.Colo. 2012) (finding that "good cause existed to permit early discovery because Plaintiff would be unable to identify Defendant's and his 'joint tortfeasors'' identities without the benefit of formal discovery mechanisms"); *Disc. Video Ctr., Inc. v. Doe*, 285 F.R.D. 161, 163 (D. Mass. 2012) (finding "good cause for expedited discovery because the Plaintiff has no other means of determining the identity of its defendants"). Moreover, "courts typically resist dismissing suits against John Doe defendants until the plaintiff has had some opportunity for discovery to learn the identities of" the defendants. *Coward v. Town & Vill. of Harrison*, 665 F. Supp. 2d 281, 300 (S.D.N.Y. 2009) (internal quotations and citations omitted). The D.C. Circuit of Appeals has endorsed the view that expedited discovery is allowed in order to identify unknown, or so-called, "John Doe" defendants, stating:

> It is "well established that plaintiffs are permitted to proceed against John Doe defendants so long as discovery can be expected to uncover the defendant[s'] identity." *Id*. (citing Newdow v. Roberts, 603 F.3d 1002, 1010–11 (D.C. Cir. 2010)). For this reason, plaintiffs in analogous proceedings have been permitted to proceed with limited expedited discovery prior to the parties' discovery planning conference required under Federal Rule of Civil Procedure 26(f).

*Goodwin v District of Columbia*, 2021 WL 1978795 at 4 (D.C. Cir. 2021).

In this case, good cause exists because, without discovery regarding Defendants' identities, Plaintiffs and class members will be barred from executing essential procedural actions, for instance, effecting service of process. As such, Plaintiffs and class members will be prejudiced and unable to pursue their claims.

## CONCLUSION

**WHEREFORE,** Plaintiffs respectfully request the Court to enter an Order that:

(1) grants Plaintiffs' Motion for Expedited Discovery prior to a Rule 26(f) conference;

(2) requires third parties to provide the information and documents responsive to Plaintiffs' subpoenas; and

(3) provides any other relief the Court deems just and proper.


Dated: September 12, 2022                              Respectfully Submitted

                                                         /s/ *James Wertheim*
                                                         James Wertheim
                                                         Bar No. OH0055
                                                         LawHQ, P.C.
                                                         299 S. Main St. #1300
                                                         Salt Lake City, UT 84111
                                                         385-285-1090 ext. 30049
                                                         jim@lawhq.com

                                                         *Attorney for Plaintiffs*